UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | |
|---|---|
| Priority | ____ |
| Send | ____ |
| Enter | ____ |
| Closed | ____ |
| JS-5/JS-6 | ____ |
| Scan Only | ____ |

CASE NO.: CV 11-09448 SJO (PJWx)   DATE: January 15, 2013

TITLE: Timothy D. Reuben v. United States of America

========================================================================

PRESENT: THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                           Not Present
Courtroom Clerk                            Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**        **COUNSEL PRESENT FOR DEFENDANT:**

Not Present                                Not Present

========================================================================

**PROCEEDINGS (in chambers): ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** [Docket No. 24]; **GRANTING DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT** [Docket No. 25]

This matter is before the Court on Plaintiff Timothy D. Reuben's ("Plaintiff") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Plaintiff's Motion"), filed December 6, 2012, and Defendant United States of America's ("Defendant" or the "Government") First Motion for Summary Judgment ("Defendant's Motion") (collectively, "Motions"), filed December 7, 2012. Plaintiff and Defendant filed their Oppositions[1] on December 17, 2012, to which the parties filed their Replies on December 21, 2012. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for January 7, 2013. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **DENIES** Plaintiff's Motion and **GRANTS** Defendant's Motion.

I.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed. In 1989, the Don H. and Jeannette H. Reuben Children's Irrevocable Trust (the "Reuben Trust") purchased an insurance policy from Manulife, a mutual life insurance company. (Pl.'s Statement of Genuine Issues in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s SGI") ¶ 1, ECF No. 26-1.) In a mutual life insurance company such as Manulife, the insurance policyholders are members of the company and have membership interests in the company, in addition to holding the insurance policy. (United States' Resp. to Pl.'s Statement of Facts in Supp. of Pl.'s Mot. for Summ. J. ("Def.'s SGI") ¶ 2, ECF No. 27-1.) These interests include the right to elect the board of directors, the right to dividends if any are declared, the right to receive the distribution of any remaining surplus in the event the company liquidates, and the

---

[1] Plaintiff also filed objections to statements made in Defendant's Motion. (Objection to Evidence Submitted in Supp. of Def.'s Mot. for Summ. J., ECF No. 26-3.) Because the Court does not rely on any of these statements, it declines to rules on these objections.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.:   CV 11-09448 SJO (PJWx)           DATE:   January 15, 2013

right to participate in the distribution of benefits in the event of demutualization.  (Def.'s SGI ¶ 3.) Unless and until the company demutualizes, these membership interests are inseparable from the underlying insurance policies.  (Pl.'s SGI ¶ 9.)

The Reuben Trust made premium payments on its policy in excess of $1.7 million from 1989 until 1999.  (Def.'s SGI ¶¶ 11-12.)  In 1999, Manulife demutualized, meaning that it converted from a mutual company to a stock company.  (Pl.'s SGI ¶ 2.)  Shares of Manulife began to be publicly traded on September 24, 1999, and eligible members of Manulife were entitled to receive common shares, cash, a combination of shares and cash, or policy credits in exchange for their membership interests.  (Def.'s SGI ¶ 5.)  On December 9, 1999, the Reuben Trust received 40,307 shares of stock in connection with the demutualization of Manulife.  (Pl.'s SGI ¶ 4.)  On December 9, 2004, 5,001 of these shares (the "Manulife Shares") were distributed to Plaintiff by the Reuben Trust.  (Pl.'s SGI ¶ 4.)  Plaintiff sold 1,000 of the Manulife Shares on January 3, 2005, for a total sale price of $45,928.97.  (Pl.'s SGI ¶ 5.)  Plaintiff sold another 3,000 Manulife Shares on September 27, 2005, for a total sale price of $158,950.40.  (Pl.'s SGI ¶ 5.)

On his 2005 tax return, Plaintiff listed the basis for these Manulife Shares as zero, which was consistent with the IRS's position that members of a mutual insurance company have no basis in the stock received during demutualization.  (Pl.'s SGI ¶ 6.)  However, on September 18, 2008, Plaintiff filed a Form 1040X to claim a tax refund in the amount of $64,259 and filed an amended 2005 tax return.  (Def.'s SGI ¶ 27.)  Plaintiff based his claim for a tax refund on two alleged errors in his 2005 tax return.  First, Plaintiff claimed he inaccurately characterized long term gain as short term gain. (Def.'s SGI ¶ 28.)  Second, Plaintiff changed the basis value of his Manulife Shares from zero to $41.13[2] per share.  (Def.'s SGI ¶ 28.)  Plaintiff changed the basis value of the Manulife Shares because of a decision by the Court of Federal Claims, *Fisher v. United States*, 82 Fed. Cl. 780 (2008), where, following a full trial, the court found that the plaintiff in that case had cost basis in stock received in connection with the demutualization of an insurance company and was thus entitled to a tax refund.  (Def.'s SGI ¶¶ 22-25.)  Thus, in his claim for a tax refund, Plaintiff stated that because the court in *Fisher* had determined the IRS's position that taxpayers have zero basis in stock received in connection with demutualization was incorrect, Plaintiff was similarly entitled to a refund.  (Pl.'s SGI ¶ 45.)

While the IRS allowed Plaintiff's tax refund of $39,581 based on Plaintiff's inaccurate characterization of long term gain as short term gain, it rejected Plaintiff's contention that he was entitled to any basis in the Manulife Shares.  (Def.'s SGI ¶¶ 34, 35, 39.)  Plaintiff appealed this decision on December 9, 2009.  (Def.'s SGI ¶ 40.)  On October 13, 2011, the IRS informed Plaintiff that it was suspending action on Plaintiff's appeal until the conclusion of proceedings in

---

[2]   Plaintiff later revised this figure to $42.38 per share.  (Def.'s SGI ¶ 30.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-09448 SJO (PJWx)	DATE: January 15, 2013

another case in which the cost basis of stock received in connection with demutualization is at issue, *Dorrance v. United States*, No. CV 09-01284-GMS (D. Ariz.). (Def.'s SGI ¶ 41.)[3]

Thereafter, on November 14, 2011, Plaintiff filed his Complaint against Defendant. Plaintiff seeks a tax refund in the amount of $25,428, plus interest, based on his contention that he had a cost basis in the Manulife Shares consistent with the court's opinion in *Fisher*. (*See generally* First Am. Compl. ("FAC"), ECF No. 21.) On December 6 and December 7, 2012, Plaintiff and the Government filed cross-motions for summary judgment.

II.	DISCUSSION

　　A.	Legal Standard

　　　　1.	Standard on Summary Judgment

Federal Rule of Civil Procedure 56(a) mandates that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party need not produce any evidence or prove the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325. Rather, the moving party's initial burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. At

---

　　[3] Litigation in *Dorrance* is still pending at this time.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: CV 11-09448 SJO (PJWx)          DATE: January 15, 2013

the summary judgment stage, a court does not make credibility determinations or weigh conflicting evidence. *See id.* at 249. A court deciding a summary judgment motion must view the facts, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

On cross-motions for summary judgment, the Court must review each motion separately to determine whether either party has met its burden, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003); *see also Fair Hous. Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (when parties submit cross-motions for summary judgment, "each motion must be considered on its own merits" and "the court must review the evidence submitted in support of each cross-motion").

    2.    <u>Tax Refund Standard</u>

To establish a prima facie case for tax refund, a taxpayer must establish (1) that the IRS assessment was either illegal or erroneous; and (2) the correct amount of the refund. *See e.g.*, *Helvering v. Taylor*, 293 U.S. 507, 514 (1935).

    B.    <u>Plaintiff's Motion for Summary Judgment</u>

The parties do not dispute that Plaintiff sold some of his Manulife Shares for $204,849.37 in tax year 2005. (Def.'s SGI ¶¶ 19, 20.) Rather, the parties differ on whether Plaintiff had any cost basis in the Manulife Shares. The amount of Plaintiff's taxable gross income on his sale of the Manulife Shares is determined by looking to the "excess of the amount realized" from the sale of the Manulife Shares "over the adjusted basis . . . ." I.R.C. § 1001(a). In general, a taxpayer's basis in property is "the cost of such property . . . ." I.R.C. § 1012(a). Defendant maintains that the Reuben Trust paid nothing for the membership rights in Manulife, and thus Plaintiff's basis in the Manulife Shares, which the Reuben Trust received in exchange for those rights when Manulife demutualized, is zero.[4] At a minimum, Defendant contends, Plaintiff has not satisfied his burden of establishing the basis for the Manulife Shares such that summary judgment for Plaintiff is appropriate. *Coloman v. Comm'r*, 540 F.2d 427, 429 (9th Cir. 1976) (finding that the burden of establishing basis in a property "rest[s] on the taxpayer").

Plaintiff, on the other hand, argues that (1) the Reuben Trust's ownership rights in Manulife had some value prior to the demutualization of Manulife, and this value was not *de minimis*;

---

    [4] Because Plaintiff has alleged that the Reuben Trust transferred the Manulife Shares to Plaintiff, Plaintiff's basis in the sold Manulife Shares is transfer basis as provided by I.R.C. § 643(e)(1). Defendant stipulates for the purposes of these Motions that "the trust existed, the transfer was valid, and the trust purchased the insurance at issue." (Def.'s Mot. 1 n.2.)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** CV 11-09448 SJO (PJWx)         **DATE:** January 15, 2013

(2) because it is impossible or impracticable to determine the value of these ownership rights, the Open Transaction Doctrine applies to the calculation of the basis value in the Manulife Shares, allowing Plaintiff to apply gains received from the sale of the Manulife Shares to the basis for all of the Manulife Shares received by Plaintiff without apportioning basis between the sold Manulife Shares and the retained Manulife Shares; and (3) applying the Open Transaction Doctrine results in a basis value of $42.38 per share, which value is derived by dividing the total amount of premiums paid by the Reuben Trust by the amount of shares of Manulife stock received by the Reuben Trust upon demutualization.  (*See generally* Pl.'s Mot.)  Plaintiff bases his argument in large part on the court's decision in *Fisher* to apply the Open Transaction Doctrine.  It will thus be useful to examine that decision in order to determine the doctrine's applicability here.

> 1. <u>The Open Transaction Doctrine and the *Fisher* Decision</u>

In general, "when property is acquired in a lump-sum purchase but then divided and sold off in parts, the cost basis of the property should generally be allocated over the several parts." *Gladden v. Comm'r*, 262 F.3d 851, 853 (9th Cir. 2001) (citing Treas. Reg. § 1.61-6(a)).  Under the Open Transaction Doctrine, however, when it is "'impossible or impractical' to apportion basis among several portions of a property, a taxpayer need not recognize any capital gain until the entire cost basis of the property has been recovered."  *Gladden*, 262 F.3d at 856.

The Open Transaction doctrine originated in the Supreme Court's decision in *Burnet v. Logan*, 283 U.S. 404 (1931).  There, the plaintiff owned a portion of an iron mining company.  *Id.* at 409.  When the iron mining company was sold, the plaintiff received both an initial lump sum payment as well as future contingent payments in exchange for her shares in the company.  *Id.*  In determining the plaintiff's tax liability, the IRS estimated the present value of the future contingent payments and apportioned the plaintiff's basis in the lump sum payment and the future contingent payments in accordance with their ratio at the time of distribution.  *Id.* at 411.  The Supreme Court found this to be incorrect, as the value of the future contingent payments was too uncertain to be accurately estimated.  *Id.* at 413.  Thus, the Supreme Court held, the plaintiff could apply the whole basis for the original stock in the company to the lump sum payment.  *Id.*  As a result, she realized no taxable gain at that time, but would instead realize such a gain if the future contingent payments ultimately exceeded her initial capital expenditure for the shares of the company.  *Id.*  The Supreme Court reasoned that the transaction in which plaintiff's shares of the company were sold was "not a closed one[,]" and so it was not appropriate to tax plaintiff until the profits or losses from the sale were fully realized.  *Id.*

Since *Burnet*, the doctrine has been applied by the courts infrequently.  *See, e.g.*, *Pierce v. United States*, 49 F. Supp. 324 (Ct. Cl. 1943) (applying Open Transaction Doctrine to taxpayer's interest in security company that was dissolved); *Inaja Land Co., Ltd. v. Comm'r*, 9 T.C. 727 (Tax Ct. 1947) (applying the doctrine to situation involving indefinite easement over taxpayer's land).  The application of the doctrine has more often been rejected, including in cases in the Ninth Circuit. *See, e.g.*, *Gladden*, 262 F.3d at 856; *LaFargue v. Comm'r*, 800 F.2d 936, 939-40 (9th Cir. 1986);

*In re Steen*, 509 F.2d 1398, 1404-05 (9th Cir. 1975); *Clodfelter v. Comm'r*, 426 F.2d 1391, 1394 (9th Cir. 1970). The Open Transaction Doctrine applies "only to the 'rare and extraordinary' case . . . that present[s] elements of value so speculative in character as to prohibit any reasonably based projection of worth." *Campbell v. United States*, 661 F.2d 209, 214-15 (Ct. Cl. 1981). Indeed, since 1957, when Treas. Reg. § 1.61-6(a), providing for the apportionment of basis when property is sold in parts, was promulgated, the Open Transaction Doctrine has been applied in only three situations. Two of these cases involved the granting of indefinite easements in real property when the easements did not exist when the property was purchased. *See Foster v. Comm'r*, 80 T.C. 34 (1983); Rev. Rul. 77-414, 1977-2 C.B. 299. The other was the Court of Federal Claims's decision in *Fisher*.

The plaintiff in *Fisher* purchased a life insurance policy from a mutual life insurance company. *Fisher*, 82 Fed. Cl. at 782. Plaintiff paid premiums, for which he received both the insurance policy and ownership rights in the company. *Id.* The company later demutualized. *Id.* at 83. Instead of receiving shares in the company, the plaintiff elected to receive cash. *Id.* The plaintiff reported this amount on his tax return, without any corresponding basis. *Id.* The plaintiff later sought a tax refund, however, claiming that he was entitled to some basis in the shares because the ownership rights had value. *Id.* The government maintained that the plaintiff had no basis in the shares because "none of the premiums were specifically dedicated to acquiring the ownership rights, . . . there was no available market for the ownership rights, and . . . it was highly unlikely, at the time the policy was acquired, that a demutualization would occur." *Id.* Plaintiff, by contrast, argued that the value could not be ascertained, and thus the Open Transaction Doctrine should apply. *Id.* After a full trial, including expert testimony on behalf of both the plaintiff and the government, the court found for the plaintiff and held that he was entitled to his requested refund. *Id.* at 799. In effect, the court agreed with the plaintiff's expert that the ownership rights had some value but that value could not be ascertained, and thus the Open Transaction Doctrine applied.

    2.  <u>The Application of *Fisher* to Plaintiff's Case</u>

Plaintiff contends that "the facts here mirror the facts in <u>Fisher</u>, which must control the outcome." (Pl.'s Mot. 11.) The Court does not agree. As an initial matter, decisions of the Court of Federal Claims are not controlling on this Court. This is not altered by the fact that the court's decision in *Fisher* was affirmed in an unpublished opinion of the Federal Circuit. *See Fisher v. United States*, 333 Fed. App'x 572 (Fed. Cir. 2009). Unpublished opinions do not have precedential effect even for the Federal Circuit. *Fisher* is at best persuasive authority. For the reasons set forth below, the Court declines to follow *Fisher*.

First, the court's decision in *Fisher* has drawn criticism. The only other court to have considered *Fisher* on the merits rejected its reasoning in deciding a case with facts similar to those here. *See Dorrance*, --- F. Supp. 2d ----, 2012 WL 2798649, at *6-7 (D. Ariz. July 9, 2012). There, the court found that the plaintiffs had "failed to show that allocating basis between the mutual rights and the stock is so difficult that this case requires applying the open transactions doctrine." *Id.* at *6. The

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  CV 11-09448 SJO (PJWx)     **DATE:**  January 15, 2013

court denied plaintiffs' motion for summary judgment.  *Id.* at *8.  In doing so, the court observed that "the arguments advanced by the parties in *Fisher* may have made it appear more difficult to allocate basis under the regulations than it actually was . . . [because] neither party addressed how use of the [Open Transaction Doctrine] could be avoided altogether by applying reasonable alternative basis apportionment methods."  *Id.* (internal quotation marks and citation omitted).  The court also rejected the government's motion for summary judgment, as the court found that "[p]laintiffs have demonstrated that they may have had some basis in the mutual rights . . . ."  *Id.* at *9.  The court set the case for trial with instructions that the parties should "present[] evidence from which the [c]ourt [may] equitably apportion the premiums paid before demutualization as basis in the mutual rights and basis in the policies themselves."  *Id.* at *8.

Others have criticized the *Fisher* decision due to factual distinctions between situations where the Open Transaction Doctrine has historically applied and the situation before the court in *Fisher*.  For instance, Defendant points out that the doctrine has traditionally been applied only to "situations where the IRS and the taxpayer can determine more accurately the taxpayer's tax liability if they 'wait and see.'" (Def.'s Opp'n 21 (citing *Garvey, Inc. v. United States*, 726 F.2d 1569, 1573 (Fed. Cir. 1984)).)  In other words, the Open Transaction Doctrine has been used when the "transaction" in question will later "close," and the taxpayer's tax liability can be determined at that time.  By contrast, in this case "the parties will not be able to more accurately determine the taxpayer's liability in the future." (Def.'s Opp'n 21.)  This is so, as one commentator has noted, because "life insurance policies are generally held until the death of the insured, at which time the basis is no longer needed." Stephen J. Olsen, *Chuck v. Goliath: Basis of Stock Received in Demutualization of Mutual Insurance Companies*, 9 Hous. Bus. & Tax L.J. 360, 382-83 (2009).  If the policy is never sold, therefore, application of the Open Transaction Doctrine will result in "[t]he taxpayer . . . getting a windfall, because all of the basis may be allocated to the assets that will be sold, while the asset that does not require basis has its basis reduced." *Id.* at 383.  Such a result would, in effect, create a new tax loophole without any foundation in the Internal Revenue Code or governing regulations.

Second, the facts in the instant case, while similar to those in *Fisher*, are materially distinguishable.  Most significantly, whereas in *Fisher* the plaintiff elected to receive cash in lieu of shares in the mutual life insurance company at the time of demutualization, here Plaintiff sold the Manulife Shares in question some six years following their distribution to the Reuben Trust.  (Pl.'s SGI ¶¶ 4, 5.)  Thus, as in *Dorrance*:

> The [O]pen [T]ransaction[] [D]octrine would . . . allow Plaintiff[] to apply this gain to basis accrued through policy payments made before [de]mutualization, even though the increase in value took place entirely after the rights were split.  At the same time, since the open transaction doctrine would not recognize any separate bases in the policy and the stock, policy payments made after the companies demutualized would increase the total basis towards which the stock

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-09448 SJO (PJWx)          DATE: January 15, 2013

> sale would be applied, even those these payments were not made to obtain the mutual rights or the stock.

*Dorrance*, 2012 WL 2798649 at * 7.

Another important difference between *Fisher* and this case is their different procedural postures. The court in *Fisher* reached its conclusion that the Open Transaction Doctrine applied only after a full bench trial, including expert testimony from both parties. By contrast, Plaintiff here seeks the application of the Open Transaction Doctrine on a motion for summary judgment. The Court cannot apply the doctrine because Defendant has submitted substantial evidence that the Reuben Trust paid nothing for the membership rights.[5] For example, Defendant has hired Ralph J. Sayre, an actuary who opines that the monetary value of the membership rights "is best stated as negligible or zero predemutualization." (Decl. of Ashley J. Brick in Supp. of Pl.'s Mot. for Summ. J. Ex. G ("Sayre Report"), at 10, ECF No. 24-3.) In light of this evidence, and drawing all reasonable inferences in the light most favorable to the Defendant for the purposes of Plaintiff's Motion, the Court cannot conclude that Plaintiff is entitled to judgment as a matter of law. *See Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1441 (9th Cir. 1993).

Plaintiff has also "failed to show that allocating basis between the mutual rights and the stock is so difficult" that application of the Open Transaction Doctrine is appropriate. *Dorrance*, 2012 WL 2798649 at *6. The Ninth Circuit has provided that the "taxation of an 'open' transaction is deferred only to the extent that consideration received by the seller consists of property having no ascertainable fair market value in the year of sale." *In re Steen*, 509 F.2d 1398, 1404-05 (9th Cir. 1975). Here, as in *Dorrance*, the Reuben Trust "received stock, and retained a marketable life insurance policy; it is practical and possible in such circumstances to ascertain the value of these assets in the year of sale." *Dorrance*, 2012 WL 2798649 at *6.

Accordingly, Plaintiff's Motion is **DENIED**. Further, the Court finds that application of the Open Transaction Doctrine is inappropriate for the reasons articulated.

      C.     Defendant's Motion for Summary Judgment

Defendant contends that, pursuant to Ninth Circuit precedent, summary judgment for Defendant is appropriate because "the undisputed material facts show that nothing was paid for the mutual insurance company membership interests that were deemed exchanged for the stock that the Plaintiff received . . . [and] therefore, he had no cost basis in that stock . . . ." (Def.'s Mot. 1.) Specifically, Defendant argues that application of the Ninth Circuit's decision in *Gladden* to the instant facts mandates a finding that the Plaintiff's cost basis in the sold Manulife Shares was

---

[5] This evidence is considered in greater detail below in the context of Defendant's Motion.

CASE NO.:   CV 11-09448 SJO (PJWx)            DATE:  January 15, 2013

zero. (Def.'s Mot. 5.) The Court first examines the Ninth Circuit's decision in *Gladden* before determining its applicability to this case.

  1.  The Ninth Circuit's Decision in *Gladden*

In *Gladden*, the plaintiffs purchased land that had no appurtenant water rights at the time of purchase. *Gladden*, 262 F.3d at 852. Later, however, the plaintiffs obtained water rights in connection with the Central Arizona Project, which brought water from the Colorado River to, among other places, plaintiffs' land. *Id.* The plaintiffs sold these water rights, but claimed as a cost basis "the portion of the original purchase price that they claimed was paid for the expectation of water rights." *Id.* The IRS disagreed and found that plaintiffs were not entitled to any cost basis at all. *Id.* The Ninth Circuit held that "where a purchaser pays a premium for land based on a realistic expectation that water rights will attach to that land in the future, the purchaser may, upon sale of the later-acquired water rights, claim a cost basis equal to the premium paid." *Id.* at 855. Applying this rule to the facts at hand, the Ninth Circuit held that plaintiffs could apportion some of the cost basis of the land purchase to the sale of the water rights because they had "a realistic expectation that water rights would eventually attach to the land." *Id.* at 854-55. The court ultimately remanded the case because it could not determine on the record before it "either what portion of the cost of the land may have been a premium paid for the water rights later acquired by the partnership, or whether it is 'impracticable or impossible' to determine what that premium may have been." *Id.* at 856.

Defendant contends that, under *Gladden*, Plaintiff is required to prove that "(1) the Reuben Trust paid a premium (*i.e.*, an amount in addition to what they would have otherwise been required to pay for a life insurance policy) for the membership interests and (2) there was a 'realistic expectation' that [Manulife] would demutualize when the policy was purchased . . . ." (Def.'s Mot. 8.) This proposed test misconstrues the holding of *Gladden* because the Ninth Circuit only required the plaintiffs in *Gladden* to demonstrate a "realistic expectation" that water rights would later attach to the land because the land had no water rights at the time of purchase. If, on the other hand, "the water rights had already been vested when the [plaintiffs] had purchased the land," then Treas. Reg. § 1.61-6(a), providing for the equitable apportionment of cost basis "would be easy to apply . . . ." *Gladden*, 262 F.3d at 853. This more closely resembles the situation here: the membership rights in Manulife were vested at the time the Reuben Trust purchased the life insurance policy, and so Plaintiff need not demonstrate that they had a realistic expectation that Manulife would demutualize. Instead, Plaintiff is only required to show that some portion of the premiums paid to Manulife were in compensation for the ownership interests. The Court now turns to the evidence submitted on this issue.

  2.  Whether a Premium Was Paid for the Membership Interests in Manulife

It is the taxpayer's burden to establish that they have a basis in property. *Coloman*, 540 F.2d at 429. "The fact that basis may be difficult to establish does not relieve a taxpayer from his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

CASE NO.: CV 11-09448 SJO (PJWx)          DATE: January 15, 2013

burden." *Id.* at 430.  If the taxpayer fails to satisfy this burden, the basis is generally found to be "zero." *Id.* at 431.  If, however, it is clear that some amount has been paid for property, but it is not possible to determine that amount "with exactitude", then it is not appropriate to declare the basis to be zero. *Id.* (citing *Cohan v. Comm'r*, 39 F.2d 540, 543-44 (2d Cir. 1930) (Hand, L., J.)).  Rather, the government "should make as close an approximation as it can . . . ." *Cohan*, 39 F.2d at 544.

Plaintiff rests his argument that some portion of the premiums paid by the Reuben Trust were in compensation for the membership rights on the fact that "the Reuben Trust paid over $1.7 million in premiums on a policy that included membership rights and policy rights, prior to demutualization." (Pl.'s Opp'n 7.)  Plaintiff further avers that "[i]t was impossible to separate the value of the membership rights from the policy rights prior to demutualization, but it is undisputed that if a member stopped paying premiums, the membership rights would expire." (Pl.'s Opp'n 7.)  Plaintiff provides no evidence in support of the proposition that it was in fact impossible to value the policy rights and the membership rights separately other than the decision of the court in *Fisher*, which the Court has already decided not to follow.  Plaintiff also provides no evidence demonstrating that some portion of the premiums were paid for membership interests.  Instead, Plaintiff makes the conclusory assertion that "the facts show that the premiums paid by the Reuben Trust paid for the membership rights." (Pl.'s Opp'n 7.)

Defendant, by contrast, adverts to substantial evidence in support of the proposition that none of the premiums paid by the Reuben Trust were for the membership interests in Manulife, as opposed to the underlying life insurance policy.  First, Defendant notes that, at the time of demutualization, Manulife informed its policyholders that "[t]he cost of Common Shares acquired in exchange for Ownership Rights will be nil," and that:

> For United States federal income tax purposes, . . . your tax basis in the Common Shares will be zero. . . . Although you will not recognize any gain or loss at the time you receive the Common Shares, if you subsequently sell or dispose of the Common Shares, you will recognize a gain . . . equal in amount to the full amount of proceeds realized from such sale . . . .

Decl. of Joseph A. Sergi in Supp. of Def.'s Mot. for Summ. J. ("Sergi Decl.") Ex. A, at 45, 48, ECF No. 25-5.)  Further, an independent actuary hired by Manulife to review the company's demutualization stated that "Demutualization Benefits are a windfall to the Eligible Policyholders, as presumably none of them purchased a policy in anticipation of [Manulife's] . . . demutualization." (Sergi Decl. Ex. A, at IV-9.)  Likewise, the trust administrator of the Reuben Trust informed trust beneficiaries that "the acquisition date of this stock is December 9, 1999 and the cost basis is zero." (Sergi Decl. Ex. F, at US000355, ECF No. 25-14.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   CV 11-09448 SJO (PJWx)           DATE:   January 15, 2013

Plaintiff does not dispute that these statements were made.  Rather, Plaintiff argues that "there is no evidence that either [the Reuben Trust administrator] or Manulife performed any cost basis analysis" when these statements were made.  (Pl.'s Reply 1.)  Plaintiff also contends that "Manulife's zero basis position is based solely on the IRS's position" that mutual life insurance company policyholders have zero cost basis in the shares received during demutualization. (Pl.'s Reply 1.)[6]  Notably, Plaintiff does not address the fact that an independent actuary also opined that the shares received by the Reuben Trust as a result of Manulife's demutualization constituted a windfall.  Plaintiff's point that Manulife's position on the cost basis of stock received in demutualization appears to be based on the IRS's position is well-taken, however, and the Court discounts Manulife's statements to that effect accordingly.

Second, as mentioned above, Defendant hired an expert, actuary Ralph J. Sayre ("Sayre"), who opines that  the value of the membership rights prior to demutualization was "zero" and that "[t]here [was] no identifiable charge in the premium for" these rights. (Sayre Report 29.)  Sayre goes on to state that it was only the "process of demutualization that gave them a monetary value at the time of exchange." (Sayre Report 30.)  Sayre reached these conclusions after performing valuation analyses of the membership rights under three different approaches. (Sayre Report 28-30.)

Plaintiff has submitted an expert opinion of his own.  J. David Foxman ("Foxman"), a certified public accountant, opines that "[t]he Manulife ownership rights had value, but at the time the policy was purchased, those ownership rights could not be separated from the insurance policy or sold separately." (Decl. of J. David Foxman in Supp. of Pl.'s Mot. for Summ. J. Ex. A ("Foxman Report"), at 7, ECF No. 24-4.)  It is evident from Foxman's report, however, that this conclusion is based entirely on the *Fisher* decision, as Foxman states that "[t]he Fisher case, affirmed on appeal, found that the ownership rights had value, but were, at the outset, inextricably tied to the underlying insurance policy and were not separately sellable; and that this was an appropriate situation" to apply the open transaction doctrine. (Foxman Report 5.)  Thus, Foxman did not perform an independent valuation of the membership rights.[7]  More significant, though, is the fact that Foxman does not opine as to whether any portion of the premiums paid were in compensation for the membership rights.  The issue is whether the Reuben Trust paid anything for the membership rights, **not** whether those membership rights had any value.  *See Coloman*,

---

[6]  Manulife's web site states that "US tax regulators ruled that shares received through Demutualizations such as those of Manulife . . . have a tax cost basis of zero." (Supplemental Decl. of Ashley J. Brick in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. Ex. A, at 1, ECF No. 26-2.)

[7]  This stands in contrast with both *Fisher* and *Dorrance*, where the plaintiffs provided expert testimony concerning the valuation of the plaintiffs' ownership rights and policy rights in the mutual life insurance company.  *See Fisher*, 82 Fed. Cl. at 783; Final Pretrial Order, *Dorrance v. United States*, No. CV 09-01284-GMS (D. Ariz.), ECF No. 99.

CASE NO.:   CV 11-09448 SJO (PJWx)              DATE:   January 15, 2013

540 F.2d at 430 (explaining that "the 'worth' or value of a piece of property may be quite different from its basis in the taxpayer's hands . . . .")  Foxman's report fails to address this issue.

Finally, the Court notes that the premiums paid for the Manulife life insurance policies were identical before and after Manulife demutualized.  (Pl.'s SGI ¶ 35.)  This further supports the proposition that all of the premiums paid by the Reuben Trust prior to demutualization were for the underlying life insurance policy, and not for the membership rights.  This evidence accords with the basis apportionment method suggested in *Gladden*, where the Ninth Circuit suggested that such a valuation might be performed "by comparing the price of the land purchased by [plaintiffs] to prices of similar land  . . . without any expectation of water rights."  *Gladden*, 262 F.3d at 856.  Thus, Defendant argues, "[t]he only difference between the policies is the existence of the membership interests.  If a portion of the premiums paid were attributable to those interests, then the premiums should have decreased when those interests were removed." (Def.'s Mot. 9.)

Plaintiff responds that "the voting right given to the policyholders of the stock company after demutualization was much more significant" and "the corporate stock given to policyholders was . . . not subject to termination with the underlying policy as the membership rights were previously."  (Pl.'s Opp'n 8; *see* Sergi Decl. Ex. A, at 9-10.)  As a result, Plaintiff argues, the comparison of premiums paid for the life insurance policies before and after demutualization is not an apples-to-apples comparison, and so the Court should not conclude too much from the fact that the premiums did not change.  (Pl.'s Opp'n 8-9.)  Additionally, Plaintiff notes that Manulife promised members that premium payments would be unaffected by the demutualization, and so "the lack of change in premium payments evidences nothing beyond the fact that Manulife stayed true to its promise."  (Pl.'s Opp'n 9 n.3.)

The Court does not view the evidence of the premiums paid before and after demutualization as dispositive in and of itself for the reasons articulated by Plaintiff.  Nevertheless, the entirety of the record establishes that none of the premiums paid by the Reuben Trust were for the membership rights in Manulife, and thus Plaintiff had no cost basis in the Manulife Shares sold in 2005.  Plaintiff also offered no evidence as to what was paid for the membership rights in particular, as opposed to the policy as a whole.  The Court therefore finds that Plaintiff has failed to satisfy his burden "to establish that the basis was other than zero . . . ."  *Coloman*, 540 F.2d at 431.

Accordingly, Defendant's Motion is **GRANTED**.

III.    RULING

For the foregoing reasons, Plaintiff's Motion is **DENIED**, and Defendant's Motion is **GRANTED**.  Judgment is granted in favor of Defendant.  This action shall close.

IT IS SO ORDERED.